| | |
|---|---|
| Boulder County, Colorado, District Court<br>1777 6th Street<br>Boulder, CO 80306<br>(303) 441-3750 | DATE FILED: July 21, 2018 10:05 AM<br>FILING ID: A6EE192724C0D<br>CASE NUMBER: 2018CV30694 |
| Plaintiffs:     Jackie Knowles & Donald Epstein<br><br>vs.<br><br>Defendant:     American Family Mutual Insurance Company | ▲ COURT USE ONLY ▲ |
| Erik G. Fischer, #16856<br>Christopher M. Drake, #46998<br>Thomas R. Peterman, Jr., #50292<br>ERIK G. FISCHER, P.C.<br>125 South Howes Street, Suite 900<br>Fort Collins, CO 80521<br>Phone:  (970) 482-4710<br>erik@fischerlawgroup.com; chris@fischerlawgroup.com, russ@fischerlawgroup.com | Case No.:<br><br>Courtroom: |
| **COMPLAINT AND JURY DEMAND** ||

COME NOW Plaintiffs, by and through counsel, Erik G. Fischer, PC, and assert the following Complaint against the above-named Defendant, stating as follows:

**PARTIES, VENUE AND JURISDICTION**

1. Plaintiffs, Jackie Knowles and Donald Epstein (hereinafter the "Plaintiffs"), own property located in Boulder County, Colorado.

2. Upon information and belief, Defendant, American Family Mutual Insurance Company (hereinafter "AmFam"), is an out of state insurance company doing business in the state of Colorado with its principal street address at 6000 American Parkway, Madison, Wisconsin 53783.

3. This Court has jurisdiction over the subject matter of this action and the parties hereto.

4. Venue is proper in this Court pursuant to C.R.C.P. 98(c)(1).

1

## **GENERAL ALLEGATIONS**

5. AmFam issued Policy Number 05-PG8518-01 (hereinafter the "Policy") to the Plaintiffs, insuring property located at 9627 Mountain Ridge Place, Boulder, CO 80302 (hereinafter the "Property") at all times relevant herein.

6. The Policy is a Colorado Gold Star Homeowner's Policy that covered, inter alia, all risks of direct physical loss or damage to the home located at the Property, including property damaged by a water event.

7. On or about December 24, 2016, the Property was damaged by water, after frozen pipes burst. The Property sustained significant water damage on each level.

8. The contents of the Property were also damaged or destroyed as a result of the water event.

9. The Plaintiffs promptly tendered to AmFam a claim for benefits for the December 24, 2016 water damage.

10. ServPro was retained to address initial mitigation/dry-out needs for the Property.

11. ServPro representatives found the home relatively dry when they arrived, and as such, there are no moisture maps with moisture readings. ServPro simply removed some of the water-damaged drywall and flooring.

12. On August 7, 2017, Plaintiffs retained The Claims Group (hereinafter "TCG") to assist in accurately capturing required repairs and associated costs for sustained water damage to the Property. An executed Notice of Representation was provided to AmFam.

13. On August 7, 2017, TCG suggested that it would be prudent to conduct a pressure test of the copper lines, and to conduct a mold test.

14. AmFam did not respond to this suggestion, and on September 15, 2017, TCG again stated that it believed it was necessary for a mold test to be conducted to establish if elevated levels of mold from the water event had been eliminated, and also that it was necessary for a pressure test to be conducted to learn if there could be unaddressed/unknown breaks elsewhere in the Property.

15. Possessions inside the Property were damaged by Category 3 water, humidity, and drywall dust throughout as a result of fallen ceiling and cuts to address the leaks inside the Property. Possessions remained within the Property for many months, as repairs could not be addressed given the difference in scope of repairs.

16. Proper Category 3 water mitigation protocol was not followed, nor were the recommendations of the Ethos Mold Report followed.

17. On September 21, 2017, TCG, the general contractor and representatives from AmFam met at the Property for a joint inspection.

18. Following the joint inspection, the general contractor, Interstate, prepared estimates for the remaining mitigation at the Property. These estimates were provided to AmFam on October 11, 2017. TCG noted that the Plaintiffs and Interstate were looking to proceed as soon as possible.

19. On October 18, 2017, TCG followed up with AmFam to inquire as to whether the estimates from Interstate were approved.

20. On October 19, 2017, AmFam indicated that it had not approved the mitigation or contents manipulation/cleaning estimates, and did not approve the Plaintiffs to proceed with the repairs. AmFam cited large differences regarding price and scope of the repairs, and disputed that the contents were damaged by dust and "category 3 humidity." AmFam further stated that it would be working on an estimate to reflect removal of the contents from the Property, storage of the contents, and return of the contents necessary to facilitate the repairs to the Property.

21. On October 20, 2017, AmFam requested Interstate's plans of the Property as well as any ESX sketches. TCG responded the same day with the available plans, and encouraged AmFam to reach out to Interstate directly for any available ESX sketches.

22. TCG also acknowledged that AmFam did not want Plaintiffs to proceed with the remaining required mitigation, due to the large, yet unidentified, differences in scope and costs. TCG requested a timeframe as to when the Plaintiffs could anticipate receiving information from AmFam regarding scope and costs to address the required mitigation.

23. Despite multiple requests, AmFam provided no input regarding the Interstate estimates.

24. AmFam continued to insist that there was no direct physical loss to personal property, and that any personal property damages due to mold/fungi would fall under the $5,000.00 mold limit. As pointed out numerous times by TCG, nearly every room in the Property had a line break, and repairs, and therefore, possessions in each room sustained direct physical damage. AmFam's insistence on seeking to capture the damage under the exceeded $5,000.00 mold limit reflects its intent on impeding a proper resolution to this claim.

25. On February 6, 2018, representatives from Belfor and Interstate met at the Property for another inspection. AmFam retained Belfor to write an estimate for the covered damages

to the Property; the estimate was for the entire loss, less any unknown damaged contents, not strictly a mitigation estimate.

26. On March 2, 2018, TCG reached out to AmFam to inquire whether there was any update from Belfor's February 6, 2018 inspection.

27. AmFam sent the Belfor estimate, as well as Belfor's proposed time frame, to TCG on March 2, 2018. The Belfor bid was for $48,251.23.

28. TCG responded to that email, confirming receipt, and indicating that AmFam would proceed with demo and issue direct payment to Belfor. TCG also requested that AmFam advise what Belfor would do with the contents in each room, where they would be stored, if they would be inventoried, and whether they would be cleaned or replaced.

29. On March 9, 2018, AmFam sent an email to TCG, indicating that AmFam would not be scheduling the work TCG described. AmFam stated that it would be up to Plaintiffs to call and hire Belfor directly if they chose to do so. AmFam stated it was only committing to the scope and price of the estimate it had approved and provided. AmFam further noted that it was extending the replacement cost benefits deadline to June 8, 2018.

30. TCG requested yet again that AmFam advise what Belfor anticipated doing with the contents in each room, where they would be stored, if they would be inventoried, and whether they would be cleaned or replaced, and also that AmFam share any Itel report it might have regarding the grade of carpet in the Property.

31. AmFam responded to instruct TCG to ask Belfor any questions regarding what it would do with the contents, and reiterated that it would be up to Plaintiffs to hire a contractor. It also stated it would email any Itel reports it had.

32. TCG sent correspondence back to AmFam, pointing out that Plaintiffs **did** choose a contractor – Interstate. However, AmFam refused to approve the estimates from Interstate, and opted to hire another party to inspect the Property and provide an estimate. Having done so, AmFam then abdicated responsibility and refused to authorize its Preferred Contractor (Belfor) to proceed, and it did with ServPro. As pointed out by TCG, if AmFam believed that the Belfor estimate captured the needs for remaining mitigation and content manipulation, why did it refuse to authorize this specific and limited work immediately?

33. In an effort to move forward on a claim that had been sitting idle for over a year due to AmFam's delays, TCG contacted Belfor directly on March 14, 2018 to request a work authorization reflecting the remaining demolition needed and the cost to complete the work, and which included language that authorized AmFam to pay Belfor directly. TCG also requested that Belfor specify how the possessions in each room would be handled.

34. On March 24, 2018, TCG again contacted AmFam and stated that Interstate, the Plaintiffs' contractor, was prepared to proceed based upon its estimates that were provided to AmFam over seven months ago.

35. In contrast, Jim Black Construction, AmFam's initial preferred contractor, had declined the project. AmFam then turned to Belfor, who prepared an estimate following a joint inspection with Interstate. Despite TCG's request nearly two weeks ago for a work authorization to move forward with mitigation, no progress was made with Belfor.

36. Despite Plaintiffs' best efforts, virtually no progress has been made on this claim in well over eighteen months. Due to AmFam's repeated delays, Plaintiffs have been forced to file suit.

## FIRST CLAIM FOR RELIEF
### (Breach of Contract)

37. Plaintiffs incorporate the above paragraphs as if fully set forth herein.

38. The Policy creates a contract of insurance.

39. By its actions, as described above, AmFam breached the contract of insurance.

40. As a direct and proximate result of said breach, the Plaintiffs are entitled to damages in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF
### (Bad Faith Breach of Insurance Contract)

41. Plaintiffs incorporate the above paragraphs as if fully set forth herein.

42. AmFam owed duties to the Plaintiffs under the Policy's implied covenant of good faith and fair dealing, wherein it covenanted that it would, in good faith, and in the exercise of fair dealing, deal with the Plaintiffs fairly and honestly, faithfully perform its duties of representation, and do nothing to impair, interfere with, hinder, or potentially injure the Plaintiffs' right to receive the benefits under the Policy.

43. AmFam acted unreasonably and breached its duties of good faith and fair dealing by its actions, which included, without limitation, the following unreasonable acts:

    a. Failing to properly investigate and evaluate the Plaintiffs' claim for Policy benefits;
    b. Failing to pay the Plaintiffs the full benefits owed under the Policy;
    c. Failing to pay amounts under the Policy in a timely manner;
    d. Failing to effectuate a prompt, fair, and equitable settlement of the Plaintiffs' claims;

    e. Failure to give equal consideration to the Plaintiffs' rights and interests as it has given its own interests;
    f. Depriving the Plaintiffs of the benefits and protections of the contract of insurance;
    g. Compelling the Plaintiffs to institute litigation in order to recover amounts due under the Policy; and
    h. Other conduct to be revealed through discovery.

## THIRD CLAIM FOR RELIEF
### (Violation of C.R.S. §10-3-1115 and Relief Pursuant to §10-3-1116)

44. The Plaintiffs incorporate the above paragraphs as if fully set forth herein.

45. C.R.S. §10-3-1115 forbids an insurer from unreasonably delaying or denying payment of a claim for benefits owed to or on behalf of a first-party claimant.

46. The Plaintiffs are first-party claimants under C.R.S. §10-3-1115.

47. AmFam has delayed the Plaintiffs' claim without a reasonable basis within the meaning of C.R.S. §10-3-1115.

48. C.R.S. §10-3-1116 provides that a first-party claimant whose claim has been unreasonably delayed by an insurer may bring an action in Colorado district court to recover reasonable attorneys' fees and court costs and two times the covered benefit.

49. Because AmFam's actions, as described above, violate C.R.S. §10-3-1115, the Plaintiffs bring this claim to recover their reasonable attorneys' fees and court costs and two times the covered benefit, as allowed under C.R.S. §10-3-1116.

    WHEREFORE, Jackie Knowles and Donald Epstein respectfully request that judgment be entered in their favor and against American Family Mutual Insurance Company as follows:

    a. For compensatory damages, both economic and non-economic, in amounts to be proved at trial;
    b. For double damages pursuant to statute;
    c. For all prejudgment interest, statutory or moratory, and post-judgment interest allowed by law;
    d. For reasonable attorneys' fees and costs of suit herein; and
    e. For such other and further relief as this Court deems just and proper.

## JURY DEMAND OF PLAINTIFF

Plaintiffs hereby demand that all issues of fact be tried to a jury of six persons.

Dated this 21st day of July 2018.

                            Respectfully submitted,

                            ***Erik G. Fischer, P.C.***

                            */s/ Christopher M. Drake*
                            Christopher M. Drake
                            *Original signature on file at the office of Erik G. Fischer, P.C. pursuant to C.R.C.P. § 121-1-26(9); filed and served electronically via ICCES.*

Plaintiffs' Address:
9627 Mountain Ridge Place
Boulder, CO  80302